UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

COMMODITY FUTURES TRADING
COMMISSION,

           Plaintiff,

v.

JEREMY SPENCE,

           Defendant.

Case No. 21-CV-0699 (JGK)

ECF Case

## CONSENT ORDER FOR PERMANENT INJUNCTION
## AND OTHER EQUITABLE RELIEF AGAINST JEREMY SPENCE

### I.     INTRODUCTION

On January 26, 2021, Plaintiff Commodity Futures Trading Commission

("Commission" or "CFTC") filed a Complaint against Defendant Jeremy Spence ("Spence" or

"Defendant") seeking injunctive and other equitable relief, as well as the imposition of civil

penalties, for violations of the Commodity Exchange Act ("Act"), 7 U.S.C. §§ 1–26, and the

Commission's Regulations ("Regulations") promulgated thereunder, 17 C.F.R. pts. 1–190 (2021)

("Complaint," ECF No. 1).[1]

### II.     CONSENTS AND AGREEMENTS

To effect settlement of all charges alleged in the Complaint against Spence without a trial

on the merits or any further judicial proceedings, Spence:

---

[1] On February 22, 2021, the USAO-SDNY charged Spence via indictment with one count of commodities fraud in violation of 7 U.S.C. §§ 9(1), 13(a)(5) and 17 C.F.R. § 180.1, and one count of wire fraud in violation of 18 U.S.C. § 1343 and 2. Indictment, *United States v. Spence*, 21 CR 116 (S.D.N.Y. Feb. 22, 2021), ECF No. 5. On November 30, 2021, Spence entered a guilty plea to commodities fraud pursuant to Count One of the Indictment. Spence was sentenced on May 11, 2022. Judgment in a Criminal Case, ECF. No. 39.

1.      Consents to the entry of this Consent Order for Permanent Injunction and Other Equitable Relief Against Jeremy Spence ("Consent Order");

2.      Affirms that he has read and agreed to this Consent Order voluntarily, and that no promise, other than as specifically contained herein, or threat, has been made by the Commission or any member, officer, agent, or representative thereof, or by any other person, to induce consent to this Consent Order;

3.      Acknowledges proper service of the summons and Complaint;

4.      Admits the jurisdiction of this Court over him and the subject matter of this action pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1;

5.      Admits the jurisdiction of the Commission over the conduct and transactions at issue in this action pursuant to the Act;

6.      Admits that venue properly lies with this Court pursuant to 7 U.S.C. § 13a-1(e);

7.      Waives:

> (a)      Any and all claims that he may possess under the Equal Access to Justice Act, 5 U.S.C. § 504 and 28 U.S.C. § 2412, and/or the rules promulgated by the Commission in conformity therewith, Part 148 of the Regulations, 17 C.F.R. pt. 148 (2021), relating to, or arising from, this action;

> (b)      Any and all claims that he may possess under the Small Business Regulatory Enforcement Fairness Act of 1996, Pub. L. No. 104-121, tit. II, §§ 201–53, 110 Stat. 847, 857–74 (codified as amended at 28 U.S.C. § 2412 and in scattered sections of 5 U.S.C. and 15 U.S.C.), relating to, or arising from, this action;

    (c)     Any claim of Double Jeopardy based upon the institution of this action or the entry in this action of any order imposing a civil monetary penalty or any other relief, including this Consent Order; and

    (d)     Any and all rights of appeal from this action;

8.    Consents to the continued jurisdiction of this Court over him for the purpose of implementing and enforcing the terms and conditions of this Consent Order and for any other purpose relevant to this action, even if Spence now or in the future resides outside the jurisdiction of this Court;

9.    Agrees that he will not oppose enforcement of this Consent Order on the ground, if any exists, that it fails to comply with Rule 65(d) of the Federal Rules of Civil Procedure and hereby waives any objection based thereon;

10.    Agrees that neither he nor any of his agents or employees under his authority or control shall take any action or make any public statement denying, directly or indirectly, any allegation in the Complaint or the Findings of Fact or Conclusions of Law in this Consent Order, or creating or tending to create the impression that the Complaint and/or this Consent Order is without a factual basis; provided, however, that nothing in this provision shall affect his: (a) testimonial obligations; or (b) right to take legal positions in other proceedings to which the Commission is not a party. Spence shall comply with this agreement, and shall undertake all steps necessary to ensure that all of his agents and/or employees under his authority or control understand and comply with this agreement;

11.    In *United States v. Spence*, 21-CR-116 (S.D.N.Y. indictment filed Feb. 22, 2021) (the "Criminal Action"), Spence pleaded guilty to violating 7 U.S.C. Sections 9(1) and 13(a)(5) and 17 C.F.R. Section 180.1, and in connection with that plea admitted the facts set out in the

3

transcript of his plea allocution, dated November 30, 2021, a copy of which is attached as Exhibit A to this Order, and those same facts are admitted as if set forth in this Order;

12.     Consents to the entry of this Consent Order without admitting or denying the allegations of the Complaint or any findings or conclusions in this Consent Order, except as to jurisdiction and venue, and those referenced above in Paragraph 11, which he admits;

13.     Consents to the use of the findings and conclusions in this Consent Order in this proceeding and in any other proceeding brought by the Commission or to which the Commission is a party or claimant, and agrees that they shall be taken as true and correct and be given preclusive effect therein, without further proof;

14.     Does not consent, however, to the use of this Consent Order, or the findings and conclusions herein, as the sole basis for any other proceeding brought by the Commission or to which the Commission is a party, other than a: statutory disqualification proceeding; proceeding in bankruptcy, or receivership; or proceeding to enforce the terms of this Order;

15.     Agrees to provide immediate notice to this Court and the Commission by certified mail, in the manner required by paragraph 115 of Part VI. of this Consent Order, of any bankruptcy proceeding filed by, on behalf of, or against him, whether inside or outside the United States; and

16.     Agrees that no provision of this Consent Order shall in any way limit or impair the ability of any other person or entity to seek any legal or equitable remedy against Spence or him in any other proceeding.

## III.     FINDINGS OF FACT AND CONCLUSIONS OF LAW

The Court, being fully advised in the premises, finds that there is good cause for the entry of this Consent Order and that there is no just reason for delay. The Court therefore directs the

entry of the following Findings of Fact, Conclusions of Law, permanent injunction and equitable relief pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1, as set forth herein.

**THE PARTIES AGREE AND THE COURT HEREBY FINDS:**

**A.    Findings of Fact**

**The Parties to this Consent Order**

17.    Plaintiff Commodity Futures Trading Commission is an independent federal regulatory agency that is charged by Congress with administering and enforcing the Act and the Regulations.

18.    Defendant **Jeremy Spence** is a natural person with a last known residence in Bristol, Rhode Island.  Spence has never been registered with the Commission.  During the Relevant Period, Spence did business under the name "Coin Signals."

**Spence's Fraudulent Scheme in Violation of Section 6(c)(1) of the Act, 7 U.S.C. § 9(1), and Regulation 180.1(a)(1)-(3), 17 C.F.R. § 180.1(a)(10-(3) (2021)**

19.    From at least in or around December 2017 through at least in or around April 2019 (the "Relevant Period"), Spence, doing business under the name "Coin Signals," operated a virtual currency Ponzi scheme in which he fraudulently solicited individuals to invest funds in various pools that traded virtual currencies such as bitcoin and ether, each a commodity in interstate commerce.  During the Relevant Period, Spence obtained virtual currencies such as bitcoin and ether, worth more than $5 million from individuals ("customers") comprising approximately 175 user accounts through fraudulent solicitations involving misrepresentations of, among other things, his trading record, assets under management, and highly profitable returns.  In fact, as Spence himself has admitted, Spence's trading resulted in significant trading losses, and Spence caused false performance reports to be provided to customers.  As in all Ponzi

5

schemes, Spence's payouts of supposed profits to customers in actuality consisted of other customers' misappropriated funds.

20.     A virtual currency is a type of digital asset defined here as a digital representation of value that functions as a medium of exchange, a unit of account, and/or a store of value, but does not have legal tender status in any jurisdiction. Bitcoin, ether, and other virtual currencies are distinct from "real" currencies, which are the coin and paper money of the United States or another country that are designated as legal tender, circulate, and are customarily used and accepted as a medium of exchange in the country of issuance.

21.     During the Relevant Period, Spence solicited and received virtual currency then equivalent to more than approximately $5,000,000 from customers comprising approximately 175 user accounts, who invested amounts ranging from fractions of bitcoin to virtual currency amounts worth hundreds of thousands of dollars, for the purpose of entering into contracts of sale of virtual currency, including bitcoin and ether, through electronic web-based virtual currency trading platforms based in various states and countries.

**The Formation and Operation of Coin Signals**

22.     In or around late 2017, Spence began doing business as Coin Signals ("CS") for the purpose of soliciting customers and others in several of the United States as well as a number of foreign countries to provide virtual currencies such as bitcoin and ether to Spence, which Spence would employ in various "funds" to engage in virtual currency trading on the customers' behalf.

23.     The CS funds included but were not limited to the Mex Fund (the "CS Mex Fund"), the Alt Fund (the "CS Alt Fund"), and the Long-Term Fund (the "CS Long-Term Fund") (collectively, the "CS Funds").

6

24. During the Relevant Period, Spence solicited customers and managed the CS Funds from New York, New York.

25. Spence's trading strategies purportedly included seeking to trade virtual currency profitably based on market volatility by, among other things, trading conservatively.

26. Spence arranged with persons ("CS admins") he met through online social media sites such as Twitter, Telegram, and Discord internet chatrooms and otherwise to assist in creating and to serve as administrators of CS chatrooms, to handle non-trading administrative aspects of the CS Funds, and to act as conduits of information and solicitations to prospective and existing customers.

27. Spence's solicitations—which, as described below, were rife with fraud, lies, and deceit—were successful. During the Relevant Period, Spence obtained virtual currencies such as bitcoin and ether worth more than approximately $5 million at the time from individual customers comprising approximately 175 user accounts.

28. These customers included retail customers, that is, customers who were not high net-worth individuals.

29. During the Relevant Period, Spence's primary virtual currency trading accounts for the CS Mex Fund trading strategy were held at an international virtual currency trading platform (the "CS Mex accounts"). In the CS Mex accounts, Spence engaged in trading of contracts of virtual currencies such as bitcoin and ether, each a commodity in interstate commerce, including on a futures contract basis (contracts in which the CS Mex account agreed to trade, e.g., a commodity such as bitcoin or ether, at a predetermined price and specified time in the future, e.g., in one week), swaps, and through the use of margin.

30. During the Relevant Period, Spence engaged in trading of virtual currencies via accounts on another international virtual currency trading platform (the "CS Alt accounts").

31. Spence also employed other virtual currency accounts in furtherance of his scheme.

32. Spence communicated with customers regarding his trading strategy and results in CS chatrooms directly and through CS admins.

33. Spence also provided customers with information such as reports of his trading results and customers' account balances by "rounds" that ranged from approximately a few days to a few weeks. Spence's reports—which, as described below, were false and misleading—generally reflected successful and highly profitable virtual currency trading.

34. Spence provided such trading and customer account information to customers through an automated computer program referred to as a "bot" (the "CS Bot"), which customers could query on demand. For a given round, Spence reported the CS Funds' trading profit-and-loss results to a CS admin, who entered that information into the CS Bot, which then calculated each customer's resulting balance and profits or losses.

35. The profit-and-loss information reported at the end of each "round" was purported to be realized profits or losses. This supposedly allowed customers to closely monitor their investments and promptly withdraw funds as they wished.

**Spence's False and Misleading Solicitations**

36. During the Relevant Period, Spence's solicitations involved exaggerations of his trading track record and ability to generate outsize returns.

37. In or around January 2018, in soliciting participation in CS, Spence touted his ability to trade successfully over the course of 2018 the funds that customers gave him to trade

8

"20x"—that is, to trade so successfully and lucratively as to return 2,000% of a customer's investment by year end.

38.      In or around March 2018, in a CS chatroom, the CS Mex Fund was touted as having averaged more than 10% in weekly profits for at least two months.

39.      Around the same time, Spence solicited a customer by touting his consistent trading gains of approximately 10% per month.

40.      Spence claimed to another prospective customer that he achieved his gains through trading virtual currencies profitably based on market volatility.

41.      These and other statements were false and misleading representations and omitted material facts.

42.      In fact, for the period January through March 2018, Spence's CS Mex accounts' trading records reflect unsuccessful virtual currency trading that resulted in significant losses well in excess of $1,000,000 (the trading records reported these losses as more than 160 bitcoin, as the records' convention was to reflect all profit and losses from trading of bitcoin, ether, and other virtual currencies as denominated in bitcoin).

43.      During the Relevant Period, Spence's solicitations also involved substantial overstatements of the amount of his assets under management.

44.      These and other statements were false and misleading representations and omissions of material facts.

45.      For example, in or around early 2018, Spence told one prospective customer that Spence had approximately $8 million in assets under management.

46.      In fact, during the Relevant Period, Spence's net balances at his CS Mex accounts and his CS Alt accounts never exceeded approximately $2 million. As of March 31, 2018,

Spence's assets under management in those accounts was less than $1 million, and as of September 30, 2018, Spence's assets under management in those accounts had dwindled to virtual currency worth less than approximately $20,000 using the then-prevailing valuation.

47.     Spence's solicitations also failed to disclose to customers that Spence was misappropriating customer funds.

48.     For example, Spence stated to customers that he requested a voluntary payment equal to 15% of customer profits, which Spence referred to as a "Tip."

49.     These and other of Spence's statements concerning his compensation were false and misleading representations and omissions of material facts.

50.     In fact, customers generally were automatically charged the 15% fee based on Spence's purported profitable trading.

51.     But because Spence suffered trading losses, Spence was not entitled to such fees. Any "Tips" Spence paid himself based on fictitious profits were, in fact, paid from customer funds and therefore misappropriated.

52.     For example, in or around September 2018, the CS Bot reported to one customer that as a result of Spence's purportedly successful trading during that "round," the customer's CS Mex Fund was charged approximately a .5 bitcoin "Tip" based on Spence's then "[c]urrent [r]ound [g]ain" of more than 5%.

53.     In fact, as of that date, the CS Mex accounts records show Spence's unsuccessful virtual currency trading had resulted in losses equivalent to more than $250,000 (the records reflect these losses, denominated by convention in bitcoin, as more than forty bitcoin).

10

54.     Similarly, like all Ponzi schemes, because Spence suffered trading losses, customer withdrawals during the Relevant Period based on the purported profits in fact were funds misappropriated from other customers.

55.     Spence made these and other false and misleading representations and omissions of material facts to prospective customers directly and through agents during the Relevant Period in person, by telephone, and online.

56.     Spence made these and other false and misleading representations and omissions of material facts to prospective customers as well as existing customers directly and through agents knowingly or with reckless disregard for the truth.

**Spence Misrepresented the Performance and Balance of the Funds**

57.     During the Relevant Period, by the CS Bot and otherwise, Spence caused numerous reports to be issued to customers claiming that their accounts or the overall balance of the funds had increased in value.

58.     These reports were false and misleading.

59.     For example, in or around September 2018, the CS Bot reported to one customer that as a result of Spence's purportedly successful virtual currency trading during that "round," the customer's CS Mex Fund deposit of more than fifty-five bitcoin (equivalent to more than approximately $325,000 using the then-prevailing valuation) had enjoyed profits of more than 5%, and that the value of the customer's deposit had increased by more than 12% in a matter of weeks.

60.     In fact, for the month of September 2018, the CS Mex accounts records show Spence's unsuccessful virtual currency trading had resulted in losses equivalent to more than $250,000 (the records reflect these losses, denominated by convention in bitcoin, as in excess of forty bitcoin).

11

61.     Similarly, Spence caused one customer to receive a report stating that the customer's initial investment had increased in value by more than 7% in a matter of weeks due to Spence's purported successful virtual currency trading.

62.     In fact, from that customer's initial investment to around the time of the additional investment, the CS Mex accounts records show that Spence's virtual currency trading had resulted in losses equivalent to approximately $600,000 to $700,000 (the records reflect these losses, denominated by convention in bitcoin, as approximately 100 bitcoin).

63.     By indicating that customers' accounts virtually always increased in value each "round," the statements also served as fraudulent solicitations for customers to invest additional funds with Spence.

64.     For example, as a result of receiving a false and misleading report of 7% growth in a matter of weeks, a customer invested an additional more than sixty bitcoin (equivalent to more than approximately $375,000 using the then-prevailing valuation) in Spence's CS Mex Fund.

65.     On or about October 1, 2018, Spence claimed to customers in a CS chatroom that over the previous nine months the CS Mex Fund had grown "from just 10btcs to 1300btcs today."

66.     As of on or about October 1, 2018, 1,300 bitcoin was approximately equivalent to more than $8 million using the then-prevailing valuation.

67.     In fact, on or about October 1, 2018, the total balance in the CS Mex accounts and the CS Alt accounts was approximately one bitcoin (equivalent to approximately $6,500 using the then-prevailing valuation).

12

68.     Spence made these and other false and misleading representations and omissions

of material facts to customers directly and through agents during the Relevant Period in person,

by telephone, and online.

69.     Spence made these and other false and misleading representations and omissions

of material facts to customers directly and through agents knowingly or with reckless disregard

for the truth.

**Spence's False and Misleading Claims of a Hack**

70.     Beginning in or around August 2018, when customers requested withdrawals of

the investments, Spence offered a series of excuses for delays in repayment, falsely represented

that there were sufficient balances in CS's bitcoin accounts, and failed to pay redemption

requests from customers.

71.     In or about Fall 2018, to explain delays in meeting customers' withdrawal

demands, Spence represented that CS had experienced a security issue—a "hack"—that caused

approximately forty bitcoin in losses (approximately equivalent to more than $250,000 using the

then-prevailing valuation).

72.     In or about November 2018, Spence represented that the "hack" actually had

resulted in approximately 150 bitcoin in losses (approximately equivalent to $1,000,000 using

the then-prevailing valuation).

73.     These statements were false and misleading.

74.     In fact, on and around the date of the purported hack, the total balance in the CS

Mex accounts and the CS Alt accounts never reached 150 bitcoin (approximately equivalent to

$1,000,000 using the then-prevailing valuation).

75.     Around the date of the purported hack, records of the CS Mex accounts and CS Alt accounts reflect no withdrawals of approximately 150 bitcoin, whether attributable to a "hack" or not.

76.     In fact, the CS Mex accounts records for September 2018 reflect virtual currency trading losses—not a "hack"—in excess of $250,000 (records reflect these losses, denominated by convention in bitcoin, as more than forty bitcoin).

77.     Spence made these and other false and misleading representations and omissions of material facts to customers concerning the "hack" directly and through agents during the Relevant Period.

78.     Spence made these and other false and misleading representations and omissions of material facts to customers directly and through agents knowingly or with reckless disregard for the truth.

**Spence's False and Misleading "Proofs of Funds"**

79.     On or about November 4, 2018, in an effort to reassure customers that they would receive their full balances soon, Spence stated to customers that "since the beginning the [M]ex [F]und is up almost 500btcs [sic]."

80.     This statement was false and misleading.

81.     In fact, from the opening of the CS Mex accounts through on or about November 4, 2018, the CS Mex Fund trade records show virtual currency trading losses of more than approximately $1,400,000 (the records reflect these losses, denominated by convention in bitcoin, as more than 200 bitcoin).

82.     In late 2018, to substantiate his claims of sufficient remaining assets to return customers' balances, Spence provided purported proofs of funds to his agents for them to convey to the customers.

14

83.     Spence's agents then conveyed the sum and substance of these purported proofs to customers.

84.     These purported proofs of funds were false and misleading.

85.     For example, in or about November 2018, Spence showed purported screenshots of the CS Mex accounts reflecting balances totaling in excess of several hundred bitcoin (equivalent to more than approximately $3,000,000 using the then-prevailing valuation).  This information in sum and substance was conveyed to customers.

86.     In fact, through November 2018, Spence's bitcoin, ether, and other virtual currency trading had resulted in the equivalent of hundreds of bitcoin in losses.

87.     In fact, at no point during November 2018 did the balance of the CS Mex accounts exceed ten bitcoin, much less the several hundred bitcoin that Spence had represented.

88.     Spence made these and other false and misleading representations and omissions of material facts to customers concerning the "proofs of funds" directly and through agents during the Relevant Period.

89.     Spence made these and other false and misleading representations and omissions of material facts to customers directly and through agents knowingly or with reckless disregard for the truth.

### Spence's Admissions of His Lies and Deceit

90.     In late 2018, after numerous efforts to conceal his misconduct and to forestall customers' withdrawal requests, Spence admitted to deceiving and misleading his customers.

91.     In or around that time, in a chat to CS customers, Spence admitted, "I've spent the past two months trying to hide my drawdowns with lies and deceit."

15

Case 1:21-cv-00699-JGK    Document 35-2    Filed 11/13/22    Page 16 of 27

92.    Also in or around that time in a chat to CS customers, Spence acknowledged that he had concealed and misrepresented losses to his customers, admitting, "I should have been more honest with my losses."

93.    In or around that time, Spence claimed that he had lied about the size of the purported hack and had downplayed it to deceive his customers.

94.    In or around that time, Spence also claimed that, contrary to the conservative strategy and prompt realization of profits he had represented to customers, he had opened and held a long bitcoin position that had suffered significant losses.

**B.    Conclusions of Law**

**Jurisdiction and Venue**

95.    This Court has jurisdiction over this action under 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1345 (district courts have original jurisdiction over civil actions commenced by the United States or by any agency expressly authorized to sue by Act of Congress). In addition, Section 6c(a) of the Act, 7 U.S.C. § 13a-1(a), authorizes the Commission to seek injunctive and other relief against any person whenever it appears to the Commission that such person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation, or order thereunder.

96.    Venue properly lies with this Court pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e), because Spence is found in, inhabits, or transacts business in this District, or because acts and practices in violation of the Act occurred, are occurring, or are about to occur, within this District.

**Fraud by Deceptive Device or Contrivance**

97.    7 U.S.C. § 9(1), makes it unlawful for any person, directly or indirectly, to:

16

[U]se or employ, or attempt to use or employ, in connection with any swap, or a contract of sale of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, any manipulative or deceptive device or contrivance, in contravention of such rules and regulations as the Commission shall promulgate by not later than 1 year after [July 21, 2010, the date of enactment of the Dodd-Frank Wall Street Reform and Consumer Protection Act] . . . .

98.     17 C.F.R. § 180.1(a), provides:

It shall be unlawful for any person, directly or indirectly, in connection with any swap, or contract of sale of any commodity in interstate commerce, or contract for future delivery on or subject to the rules of any registered entity, to intentionally or recklessly:

(1) Use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud;

(2) Make, or attempt to make, any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading;

(3) Engage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person . . . .

99.     By the conduct described above and in the Complaint, Spence violated

7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)-(3) by, among other things, in connection with

swaps, contracts of sale of commodities in interstate commerce (including virtual currencies such

as bitcoin and ether, each a commodity in interstate commerce), and/or for future delivery on or

subject to the rules of any registered entity, intentionally or recklessly making or attempting to

make untrue or misleading statements of material fact or omitting to state or attempting to omit

material facts necessary in order to make statements made not untrue or misleading, such as the

following:

> A. Issuing performance statements and updates misrepresenting the supposed amount of bitcoins and profits in each customer's purported account(s);

17

B. Misrepresenting the amount of assets under management to prospective and existing customers;

C. Misrepresenting the profitability of Spence's virtual currency trading to prospective and existing customers;

D. Failing to disclose, and omitting, that Spence's trading did not achieve the advertised performance and returns for customers;

E. Failing to disclose, and omitting, that Spence was not investing customers' funds as promised but rather using their funds to pay other customers; and

F. Failing to disclose, and omitting, that Spence was misappropriating customers' funds.

100. By the conduct described above and in the Complaint, Spence violated

7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1)–(3) by, among other things, in connection with swaps, contracts of sale of commodities in interstate commerce (including virtual currencies such as bitcoin and ether, each a commodity in interstate commerce), and/or for future delivery on or subject to the rules of any registered entity, soliciting customers with false and misleading performance statements and promises of future performance; misrepresenting and omitting material facts in communications with customers regarding the use of customers' funds; and misappropriating customers' funds. Spence engaged in the acts and practices described above and in the Complaint willfully, intentionally, or recklessly

101. Unless restrained and enjoined by this Court, there is a reasonable likelihood that Spence will continue to engage in the acts and practices alleged in the Complaint and in similar acts and practices in violation of the Act and Regulations.

18

## IV.    PERMANENT INJUNCTION

**IT IS HEREBY ORDERED THAT:**

102.    Based upon and in connection with the foregoing conduct, pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1, Spence is permanently restrained, enjoined and prohibited from directly or indirectly:

      a.    directly or indirectly, in connection with any swap, or contract of sale of any commodity in interstate commerce, or contract for future delivery on or subject to the rules of any registered entity, intentionally or recklessly:

            1.    using or employing, or attempting to use or employ, any manipulative device, scheme, or artifice to defraud;

            2.    making, or attempting to make, any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading; and

            3.    engaging, or attempting to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person,

in violation of Section 6(c)(1) of the Act, 7 U.S.C. § 9(1), and Regulation 180.1(a)(1)-(3), 17 C.F.R. § 180.1(a)(1)-(3) (2021).

103.    Spence is also permanently restrained, enjoined and prohibited from directly or indirectly:

      a.    Trading on or subject to the rules of any registered entity (as that term is defined in Section 1a(40) of the Act, 7 U.S.C. § 1a(40));

      b.    Entering into any transactions involving "commodity interests" (as that term is defined in Regulation 1.3, 17 C.F.R. § 1.3) and/or the virtual currencies bitcoin or

19

ether, for his own personal account or for any account in which he has a direct or indirect interest;

c.     Having any commodity interests and/or the virtual currencies bitcoin or ether traded on his behalf;

d.     Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests and/or the virtual currencies bitcoin or ether;

e.     Soliciting, receiving or accepting any funds from any person for the purpose of purchasing or selling any commodity interests and/or the virtual currencies bitcoin or ether;

f.     Applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such registration or exemption from registration with the Commission, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2021); and/or

g.     Acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2021)), agent or any other officer or employee of any person (as that term is defined in 7 U.S.C. § 1a(38)), registered, exempted from registration or required to be registered with the Commission except as provided for in 17 C.F.R. § 4.14(a)(9).

## V.     RESTITUTION PENALTY

### A.     Restitution

104.     Spence shall pay restitution in the amount of two million eight hundred forty-seven thousand seven hundred forty-three dollars ($2,847,743.00) ("Restitution Obligation") to the CS customers. If the Restitution Obligation is not paid immediately, post-judgment interest

20

Case 1:21-cv-00699-JGK   Document 35-2   Filed 11/15/22   Page 21 of 27

shall accrue on the Restitution Obligation beginning on the date of entry of this Consent Order and shall be determined by using the Treasury Bill rate prevailing on the date of entry of this Consent Order pursuant to 28 U.S.C. § 1961.

105. For amounts disbursed to Spence's customers as a result of satisfaction of any restitution ordered in the Criminal Action, Spence shall receive a dollar-for-dollar credit against the Restitution Obligation. Within ten days of disbursement in the Criminal Action to Spence's customers, Spence shall, under a cover letter that identifies the name and docket number of this proceeding, transmit to the Chief Financial Officer, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581, and the Office of Administration, National Futures Association, 300 South Riverside Plaza, Suite 1800, Chicago, Illinois 60606, copies of the form of payment to those customers.

106. To effect payment of the Restitution Obligation and the distribution of any restitution payments to Spence's customers, the Court appoints the National Futures Association ("NFA") as Monitor ("Monitor"). The Monitor shall receive restitution payments from Spence and make distributions as set forth below. Because the Monitor is acting as an officer of this Court in performing these services, the NFA shall not be liable for any action or inaction arising from NFA's appointment as Monitor, other than actions involving fraud.

107. Spence shall make Restitution Obligation payments, and any post-judgment interest payments, under this Consent Order to the Monitor in the name " Spence Restitution Fund" and shall send such payments by electronic funds transfer, or by U.S. postal money order, certified check, bank cashier's check, or bank money order, to the Office of Administration, National Futures Association, 300 South Riverside Plaza, Suite 1800, Chicago, Illinois 60606 under cover letter that identifies the paying Spence and the name and docket number of this

proceeding. Spence shall simultaneously transmit copies of the cover letter and the form of payment to the Chief Financial Officer, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581.

108. The Monitor shall oversee the Restitution Obligation and shall have the discretion to determine the manner of distribution of such funds in an equitable fashion to Spence's customers identified by the Commission or may defer distribution until such time as the Monitor deems appropriate.

109. Spence shall cooperate with the Monitor as appropriate to provide such information as the Monitor deems necessary and appropriate to identify Spence's customers to whom the Monitor, in its sole discretion, may determine to include in any plan for distribution of any Restitution Obligation payments. Spence shall execute any documents necessary to release funds that he has in any repository, bank, investment or other financial institution, wherever located, in order to make partial or total payment toward the Restitution Obligation.

110. The Monitor shall provide the Commission at the beginning of each calendar year with a report detailing the disbursement of funds to Spence's customers during the previous year. The Monitor shall transmit this report under a cover letter that identifies the name and docket number of this proceeding to the Chief Financial Officer, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581.

111. The amounts payable to each customer shall not limit the ability of any customer from proving that a greater amount is owed from Spence or any other person or entity, and nothing herein shall be construed in any way to limit or abridge the rights of any customer that exist under state or common law.

112.     Pursuant to Rule 71 of the Federal Rules of Civil Procedure, each customer of

Spence who suffered a loss is explicitly made an intended third-party beneficiary of this Consent

Order and may seek to enforce obedience of this Consent Order to obtain satisfaction of any

portion of the restitution that has not been paid by Spence to ensure continued compliance with

any provision of this Consent Order and to hold Spence in contempt for any violations of any

provision of this Consent Order.

113.     To the extent that any funds accrue to the U.S. Treasury for satisfaction of

Spence's Restitution Obligation, such funds shall be transferred to the Monitor for disbursement

in accordance with the procedures set forth above.

**B.     Provisions Related to Monetary Sanctions**

114.     Partial Satisfaction:  Acceptance by the Commission/CFTC or the Monitor of any

partial payment of Spence's Restitution Obligation shall not be deemed a waiver of his

obligation to make further payments pursuant to this Consent Order, or a waiver of the

Commission/CFTC's right to seek to compel payment of any remaining balance.

## VI.     MISCELLANEOUS PROVISIONS

115.     Notice:  All notices required to be given by any provision in this Consent Order

shall be sent certified mail, return receipt requested, as follows:

Notice to Commission:
    Manal M. Sultan, Deputy Director
    Division of Enforcement
    Commodity Futures Trading Commission
    290 Broadway, 6th Floor
    New York, NY 10007

Notice to NFA:
    Daniel Driscoll, Special Policy Advisor
    Suzanne Cech
    National Futures Association
    300 S. Riverside Plaza, Suite 1800
    Chicago, IL 60606-3447

23

Notice to Defendant Spence:
Jeremy Spence
11 Pleasant Street
Bristol, RI 02809

All such notices to the Commission shall reference the name and docket number of this action.

116.    Change of Address/Phone:  Until such time as Spence satisfies in full his Restitution Obligation as set forth in this Consent Order, Spence shall provide written notice to the Commission by certified mail of any change to his telephone number and mailing address within ten calendar days of the change.

117.    Entire Agreement and Amendments:  This Consent Order incorporates all of the terms and conditions of the settlement among the parties hereto to date.  Nothing shall serve to amend or modify this Consent Order in any respect whatsoever, unless:  (a) reduced to writing; (b) signed by all parties hereto; and (c) approved by order of this Court.

118.    Invalidation:  If any provision of this Consent Order or if the application of any provision or circumstance is held invalid, then the remainder of this Consent Order and the application of the provision to any other person or circumstance shall not be affected by the holding.

119.    Waiver:  The failure of any party to this Consent Order or of any customer at any time to require performance of any provision of this Consent Order shall in no manner affect the right of the party or customer at a later time to enforce the same or any other provision of this Consent Order.  No waiver in one or more instances of the breach of any provision contained in this Consent Order shall be deemed to be or construed as a further or continuing waiver of such breach or waiver of the breach of any other provision of this Consent Order.

120.    Waiver of Service, and Acknowledgement:  Spence waives service of this Consent Order and agrees that entry of this Consent Order by the Court and filing with the Clerk

24

of the Court will constitute notice to Spence of its terms and conditions. Spence further agrees to provide counsel for the Commission, within thirty days after this Consent Order is filed with the Clerk of Court, with an affidavit or declaration stating that Spence has received and read a copy of this Consent Order.

121.    Continuing Jurisdiction of this Court: This Court shall retain jurisdiction of this action to ensure compliance with this Consent Order and for all other purposes related to this action, including any motion by Spence to modify or for relief from the terms of this Consent Order.

122.    Injunctive and Equitable Relief Provisions: The injunctive and equitable relief provisions of this Consent Order shall be binding upon Spence, upon any person under his authority or control, and upon any person who receives actual notice of this Consent Order, by personal service, e-mail, facsimile or otherwise insofar as he or she is acting in active concert or participation with Spence.

123.    Counterparts and Facsimile Execution: This Consent Order may be executed in two or more counterparts, all of which shall be considered one and the same agreement and shall become effective when one or more counterparts have been signed by each of the parties hereto and delivered (by facsimile, e-mail, or otherwise) to the other party, it being understood that all parties need not sign the same counterpart. Any counterpart or other signature to this Consent Order that is delivered by any means shall be deemed for all purposes as constituting good and valid execution and delivery by such party of this Consent Order.

124.    Contempt: Spence understands that the terms of the Consent Order are enforceable through contempt proceedings, and that, in any such proceedings he may not challenge the validity of this Consent Order.

25

125.   Agreements and Undertakings:  Spence shall comply with all of the undertakings and agreements set forth in this Consent Order.

There being no just reason for delay, the Clerk of the Court is hereby ordered to enter this *Consent Order for Permanent Injunction and Other Equitable Relief Against Defendant Jeremy Spence* forthwith and without further notice.

**IT IS SO ORDERED** on this ___ day of _____, 2022.

_____
**JUDGE JOHN G. KOELTL**
**UNITED STATES DISTRICT JUDGE**

CONSENTED TO AND APPROVED BY:

Jeremy Spence

Date: 6/16/22

K. Brent Tomer
Chief Trial Attorney
Commodity Futures Trading Commission
290 Broadway, 6th Floor
New York, NY 10007
(646) 746-9738
(646) 746-9888 (facsimile)
ktomer@cftc.gov

Date: 11/15/22